UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BADWAN, et al.,

    Plaintiffs,

v.                                Case No. 2:14-CV-00179

CITY OF MILWAUKEE,

    Defendant.

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

### I. SUMMARY

In December of 2013, the City of Milwaukee revised various ordinances relating to the operation of taxicabs. One such provision, referred to as MCO § 100-50.4.a-3, increased the number of taxicab permits for the first time in more than 20 years. The City increased the number of permits by more than 30 percent, from 320 permits to 420 permits. The City's decision to increase the number of permits by 100 was arbitrary and capricious and constitutes an unlawful and improper taking of the property interest of Plaintiffs in existing permits granted by the City under prior legislation.

The City has begun implementing the new Ordinance. The City has taken applications and intends to begin the process of awarding additional permits as of March 14, 2014.

To prevent irreparable harm to the Plaintiffs, the Court should enter a preliminary injunction.

1

## II. FACTUAL BACKGROUND

Pursuant to Wisconsin statutes, the City has the authority to regulate public passenger vehicles. *See* Wis. Stat. § 349.24. In 1991, pursuant to that statutory authority, the City created a cap on the number of taxi cab permits.[1] The cap was set at the number of existing permits as of that time. The cap, as explained by then-Alderman Tom Nardelli, would thereafter require those desiring to enter the Milwaukee taxicab market to purchase a permit from an existing permit holder:

> What we are doing is we are freezing applications at the current level. So, whatever the current level is the current level, and there will be no more than that, there could be less, I suppose, if someone decided they didn't want to sell their business and just got out of it. That's their business, I suppose. But it affords everyone who now holds permit to be able to negotiate that as a business arrangement with someone who's interested in securing it.

Thereafter, all Plaintiffs (except Holley, Dixon, DeNicola and Knoll) obtained taxicab permits by purchasing the permits from individuals obtaining the permits under the 1991 arrangement. Plaintiffs individually paid thousands of dollars to do so. Plaintiffs (except Holley, Dixon, DeNicola and Knoll) obtained the permits pursuant to the understanding set forth by the City in 1991.

Plaintiffs Holley, Dixon, DeNicola and Knoll obtained permits prior to the system implemented by the City in 1991. Thereafter, however, Plaintiffs Holley, Dixon, DeNicola and Knoll detrimentally relied upon the permit system implemented by the City in 1991. In particular, Holley, Dixon, and DeNicola made economic investments, incurred expenses and

---

[1] The facts set forth herein are supported by the accompanying affidavit of Richard "Red" Christiansen.

specifically chose to forego economic benefits in reliance upon the post-1991 system. Each of the four intended to sell their respective permits to provide for retirement.

The actions of the City of Milwaukee created a property interest for the holders of taxicab permits obtained/maintained between 1991 and 2013. According to the Milwaukee City Attorney:

> A taxicab license is a protectable property interest…. Current taxicab permitees enjoy the economic benefit of a downward floating cap in the number of permits on the market due to their ability to transfer these permits on the secondary market without City oversight or involvement (but for administrative paperwork) and the ability to lease these permits to licensed drivers.

In 2013, the City passed a new taxi cab ordinance. The Ordinance, in relevant part, reads as follows:

> Not more than 100 new taxicab permits shall be issued prior to November 1, 2014. No person having a financial interest in more than one existing taxicab permit shall be eligible for a new taxicab permit, and no person shall be eligible for more than 2 new taxicab permits issued prior to November 1, 2014. The total number of permitted taxicab vehicles shall not exceed 420. Additional taxicab permits shall only be issued on and after November 1, 2014, if the total number of permitted vehicles is less than the number of vehicles permitted on January 1, 2014, plus 100. The total number of taxicab vehicle permits authorized for issuance shall be reviewed annually by the licensing committee.

Milwaukee City Ordinance (MCO) § 100-50.4.a-3.

The Ordinance at issue [hereafter referred to as "The Ordinance" or "MCO § 100-50.4.a-3."] was justified primarily on an August 2013 report by The Legislative Reference Bureau, titled: the "Review of Milwaukee Taxicab Regulation and Overview of Regulatory Models in Selected U.S. Cities." The report was prepared for the Milwaukee Common Council "to assist the Taxicab Operations Study Subcommittee of the Public Transportation Review Board in developing a report with recommendations to the Public Safety Committee of the Common Council."

3

In the report, the Legislative Reference Bureau (LRB) concluded that the number of taxicab permits currently in effect, as a ratio of cabs to population, was lower than historical averages. The LRB then concluded that applying historical ratios to current population would justify the following increases:

* If a 60-year average ratio of taxicabs to population were used, then current population would justify an increase of 63 permits.

* If a 30-year average ration of taxicabs to population were used, then current population would justify an increase in 21 permits.

According to the LRB, "no other model" historically has been used by the City of Milwaukee to justify the number of taxicab permits.

Thereafter, in November of 2013, the Public Transportation Review Board issued its own report. The report contained no additional research on the appropriateness of an increase of 100 taxicab permits.

In actuality, the current demand for taxis has fallen and continues to fall without any relationship to overall population. No rational basis exists to utilize either a 30-year or 60-year average in determining current demand levels..

Dr. Ray A. Mundy is an expert in the taxicab industry. Dr. Mundy has conducted a full range of economic, regulatory, managerial, and physical studies aimed at taxi services in metropolitan areas. He has spent over 30 years conducting such studies in more than 25 United States and Canadian cities. Dr. Mundy is director of TTLF Consulting and is a professor of Transportation and logistics at the University of Missouri-St. Louis.

According to Dr. Mundy, the City of Milwaukee's study of its need to increase taxicab permits is flawed. Dr. Mundy states that use of population ratio, as the City did in the LRB report relied upon by the Council, does not constitute a rational or valid measurement for the

4

demand for taxicab service. Dr. Mundy suggests, in part, that the City should have relied upon an analysis of taxi customer pickup data to provide insight into several areas, including total demand for taxicab service, demand concentration, wait times, trip durations, and the impact of geography and demographics on the service levels. No rational basis exists to utilize a 30-year or 60-year average in determining current demand levels.

Various taxicab interrests offered to pay for this detailed study of current taxicab usage prior to the Ordinance being proposed and enacted. But the City refused to await such a study before enacting the Ordinance including the addition of 100 permits. When holders of taxicab permits asked Alderman Robert Bauman to study whether such an increase was needed, Ald. Bauman responded that a study was "a delay tactic that he does not wish to pursue at this time." See Affidavit Exhibit B, March 8, 2013 Minutes, at p. 3. In fact, at another hearing, Ald. Bauman said the entire impetus to increase the number of permits began because of a purported "horrendous experience" he had in attempting to obtain a cab on New Year's Eve.

The selection of the number of 100 additional permits was made at the March 8 and June 14 meetings, before any study was undertaken. See Exhibit B, March 8 and June 14, 2013, minutes.

The City of Milwaukee's selection of an increase of 100 taxicab permits was arbitrary, capricious and not reasonably connected to any rational basis. The proposed increase in 100 taxicab permits was arbitrarily put forward at a committee meeting in February of 2013 before any study was undertaken. The number remained attached to the proposed legislation in spite of subsequent contradictory study and testimony.

The City has begun implementing the new Ordinance. The City has taken applications and intends to begin the process of awarding additional permits as of March 14, 2014.

### III. **DISCUSSION**

In order to prevail on a motion for a preliminary injunction at the initiation of legal proceedings, Plaintiffs must show:

(1) a likelihood of success on the merits;

(2) no adequate remedy at law exists and irreparable harm will be suffered;

(3) the balancing of harms (if the injunction were to be wrongfully denied versus if the injunction were wrongfully granted) weighs in favor of the plaintiffs, including a consideration of whether the public interest would not be disserved if the preliminary injunction were granted. *Ezell v. City of* Chicago, 651 F.3d 684, 694 (7th Cir. 2011) (citing *Christian Legal Soc'y v. Walker,* 453 F.3d 853, 859 (7th Cir. 2006)(other citations omitted); *Cooper v. Bombela,* 34 F.Supp.2d 693, 697-98 (N.D. Ill. 1999), *aff'd sub nom. Cooper v. Salazar,* 196 F.3d 809 (7th Cir. 1999).

The moving party's burden under these provisions is a "sliding scale": "the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa." *In re A&F Enterprises, Inc. II*, -- F.3d. --, Case No. 13-3192, 2014 WL 494857 (7th Cir. Feb. 7, 2014) (citing *Cavel Int'l, Inc., v. Madigan,* 500 F.3d 544, 547-48 (7th Cir. 2007)).

### 1. **Likelihood of Success on the Merits**

Where substantive due process is at issue, the court applies a two-step analysis of evaluating the likelihood of success: (a) whether Plaintiffs have established a property interest; and if so, (b) whether an ordinance was enacted or administered in an arbitrary and capricious fashion, thereby depriving plaintiffs of their property. *See Flower Cab Company v. Petitte*, 658 F. Supp. 1170, 1179 (N.D. Ill. 1987); *Cooper,* 34 F. Supp. 2d at 698.

6

### a.     The City has conceded that a property interest is established.

In a correspondence to the Milwaukee Common Council dated June 17, 2013, the Milwaukee City Attorney stated, "A taxicab license is a protectable property interest." *See* Affidavit Exhibit A, at page 5. The City Attorney also cited to *Flower Cab Company v. Petitte*, 658 F.Supp. at 1177-1179 (holding that "[a] taxicab license is clearly a valuable property right").

The City is correct that the existing licenses are protectable property. "'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement of it.'" *City-County Taxi, Inc. v. Metropolitan Taxicab Commission,* 2012 WL 2236676 (E.D. Miss. June 15, 2012) (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). "Property interests 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id*.

As a result, in due process disputes over taxicab licenses or permits, the courts look to the local legislation to determine the existence and extent of a property interest. *Id*. at *1 (examining "Certificates of Convenience and Necessity" created under St. Louis ordinance); *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 265-66 (5th Cir. 2012) (addressing New Orleans taxicab ordinance); *Minneapolis Taxi Owners Coalition, Inc. v. City of Minneapolis*, 572 F.3d 502 (8th Cir. 2009) (examining Minneapolis ordinance uncapping number of transferable taxi licenses); *Witharana v. NYC Taxi Limousine Commission*, 2013 WL 5241987 (E.D.N.Y. Sept. 17, 2013) (addressing New York City taxi licensing system); *Speed's Auto Services Group, Inc. v. City of Portland, Or.,* Case No. 3:12-CV-738-AC, 2013 WL 1826141 (D. Or. Apr. 30,

2013) (addressing constitutional challenges to Portland cab ordinance); *Boonstra v. City of Chicago*, 214 Ill. App. 3d 379, 381, 574 N.E.2d 689, 691 (Ill. App. Ct. 1991).

In 1991, the City of Milwaukee passed Milwaukee Code of Ordinance MCO § 100-50, which read in pertinent part: "Effective January 1, 1992, no new public passenger vehicle permits for taxicabs may be issued, except [name changes and transfers]." As explained by Alderman Nardelli at the time:

> What we are doing is we are freezing applications at the current level. So, whatever the current level is the current level, and there will be no more than that, there could be less, I suppose, if someone decided they didn't want to sell their business and just got out of it. That's their business, I suppose. But it affords everyone who now holds permit to be able to negotiate that as a business arrangement with someone who's interested in securing it.

Thereafter, individual Plaintiffs, except as noted, relied upon this system to obtain taxi cab permits. Individual Plaintiffs, induced by and in reliance on the City Ordinance, spent thousands, sometimes tens of thousands, of dollars to obtain these permits. Plaintiffs, all of those in this action, thereafter made personal and economic decisions based on the market value that was created by the system established by the City. These economic decisions included incurring expenses justified by the value of the permits.

The record establishes, as the City concedes, that a property interest was created.

### b. The enactment of MCO § 100-50.4.a-3, creating 100 new permits, was arbitrary and capricious.

"An action under § 1983 alleging violation of substantive due process rights is limited to a determination of whether the municipality's administration of a local ordinance was arbitrary and capricious and thereby deprived plaintiffs of their property." *Flower Cab Co. v. Petitte,* 658 F. Supp. 1170, 1179 (N.D. Ill. 1987) (citing Barbian v. Panagis, 694 F.2d 476, 480 (7th Cir.1982)). "A particular decision or action is 'arbitrary' if it is reached 'without adequate

8

determining principle or was unreasoned." *Id*. (quoting *Scudder v. Town of Greendale, Ind.*, 704 F.2d 999, 1002 (7th Cir. 1983) and citing *United States v. Carmack,* 329 U.S. 230, 243, 67 S. Ct. 252, 258, 91 L.Ed. 209 (1946)).

In deciding to implement a 30% increase in the number of taxicab permits, the City employed plenty of procedural due process (holding hearings, etc.), but its proceedings were wholly devoid of substantive due process. The proposal to increase the number of permits began because of a purported "horrendous experience" of Alderman Robert Bauman in attempting to obtain a cab on New Year's Eve. Bauman chaired the Common Council's Public Safety Transportation Review Board and began holding hearings.

On March 8, 2013, without any study and based solely on anecdotal evidence, Bauman's review board proposed an increase of 100 permits. When holders of taxicab permits asked Bauman to study whether such an increase was needed, Bauman responded a study was "a delay tactic that he does not wish to pursue at this time."

At a hearing on June 14, 2013, Bauman again indicated his desire for 100 new permits. The City Attorney's Office responded that under the law, a study should be undertaken before determining whether an increase of 100 permits would be justified. The Council's Legislative Reference Bureau (LRB) subsequently began a study of the issue.

At a July 12, 2013 hearing and later in a "preliminary report" issued in August of 2013, the LRB concluded that the number of taxicab permits currently in effect, as a ratio of cabs to population, was lower than historical averages. The LRB then concluded that applying historical ratios to current population would justify the following increases:

9

*If a 60-year average ratio of taxicabs to population were used, then current population would justify an increase of 63 permits.

*If a 30-year average ration of taxicabs to population were used, then current population would justify an increase in 21 permits.

According to the LRB, "no other model" historically had been used by the City of Milwaukee to justify the number of taxicab permits. At a meeting on August 9, 2013, when asked by Alderman Murphy the basis for using "the ratio to population," a representative of the LRB said it "was a pragmatic approach because there was not much else to base it on."

Thereafter, in November of 2013, the Public Transportation Review Board issued its own report. The report contained no additional research on the appropriateness of an increase of 100 taxicab permits. The ordinance was passed with no other "study" other than the collection of anecdotal testimony.

In actuality, the current demand for taxis has fallen and continues to fall without any relationship to overall population. No rational basis exists to utilize either a 30-year or 60-year average in determining current demand levels.

According to expert testimony, the use of population ratio is not a reasoned basis to determine the demand for taxicab service. The City of Milwaukee's study of its need to increase taxicab permits is flawed and does not constitute a rational or valid measurement for the demand for taxicab service. The City should have relied upon an analysis of taxi customer pickup data to provide insight into several areas, including total demand for taxicab service, demand concentration, wait times, trip durations, and the impact of geography and demographics on the service levels. No rational basis exists to utilize a 30-year or 60-year average in determining current demand levels.

10

The City had no reasonable basis for the increase of 100 permits. Therefore, Plaintiffs have demonstrated a likelihood of success on the merits.

### 2. No adequate remedy at law exists and Plaintiffs will suffer irreparable harm

The property interest of Plaintiffs is not absolute, but Plaintiffs are constitutionally entitled to a properly enacted and rationally based ordinance before the City may impact their financial interests. See *Flower Cab Company*, 658 F.Supp. at 1179. An ordinance which violates a constitutional interest is presumed to constitute irreparable harm with no adequate remedy at law. *Ezell,* 651 F.3d at 699.

The unsupported increase of 100 permits will undoubtedly impact the value of Plaintiffs' existing property interest and will cause a loss of goodwill and a danger of being driven out of business. Such harms cannot be cured by any subsequent financial payment, even assuming that such a remedy is available. *Gateway Eastern Railway v. Terminal Railroad Association of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994); *cf. Minneapolis Taxi Owners Coalition,* 572 F.3d at 502. In sum, no adequate remedy at law exists and Plaintiffs will suffer irreparable harm if the new ordinance continues to be put into effect.

### 3. Balance of Harms

The Ordinance at issue is the first change to the number of taxicab permits in more than 20 years. Plaintiffs simply ask that any such change be justified by an appropriate and rationally based and enacted legislation. The City and its citizens will not be harmed by the limited delay necessary to: (a) litigate whether an appropriate record existed; and if not, (b) to correct that harm by requiring the Common Council to rely upon an appropriate study before implementing any change in the number of taxicab permits. The balance of harms weighs heavily in favor of the status quo.

11

The same analysis applies to the potential impact on the public. The Plaintiffs were induced to purchase permits and/or to operate as a permit holder by the system implemented by the City of Milwaukee from 1991 through 2013. The Plaintiffs face far greater harm to a change to that system than the City and its citizens potentially face by an imprudent delay.

## IV. CONCLUSION

Based on the discussion above, the factual material submitted herein, and the expert and other testimony that the Plaintiffs will present at an evidentiary hearing, the Court should enter a preliminary injunction, enjoining the City from implementing the increase of 100 new taxicab permits as provided in MCO § 100-50.4.a-3.

Dated this 19th day of February, 2014.

        Respectfully submitted,

        s/Steven M. Biskupic
        Steven M. Biskupic
        State Bar Number 1018217
        Michelle L. Jacobs
        State Bar ID No. 1021706
        Attorneys for Plaintiffs
        Biskupic & Jacobs, S.C.
        1045 W. Glen Oaks Lane, Suite 106
        Mequon, WI 53092
        Telephone: (262) 241-0033
        Fax: (866) 700-7640
        E-mail:sbiskupic@biskupicjacobs.com
                mjacobs@biskupicjacobs.com